

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>    Peticionario<br><br>      v.<br><br>Eligio Pérez Feliciano<br><br>    Recurrido | Certiorari<br><br>2011 TSPR 199<br><br>183 DPR ____ |

Número del Caso:   CC-2010-762

Fecha: 16 de diciembre de 2011

Tribunal de Apelaciones:

                Región Judicial de Bayamón, Panel VI

Juez Ponente: Carlos A. Cabán García

Abogado de la Parte Recurrida:

                Lcdo. Elmer A. Rodríguez Berríos

Oficina de la Procuradora General:

                Lcda. María T. Caballero García<br>                Procuradora General Auxiliar

Materia: Art. 3.1 Ley 54

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico
      Peticionario

v.

Eligio Pérez Feliciano
      Recurrido

Certiorari

CC-2010-0762

SENTENCIA

En San Juan, Puerto Rico, a 16 de diciembre de 2011.

La Procuradora General comparece ante este Foro y solicita que revisemos una sentencia emitida por el Tribunal de Apelaciones. Mediante ese dictamen, se revocó el fallo condenatorio emitido por el Tribunal de Primera Instancia en el que el Sr. Eligio Pérez Feliciano fue encontrado culpable por el delito tipificado en el Artículo 3.1 de la Ley Núm. 54-1989 (8 L.P.R.A. sec. 631), conocida como la Ley para la Prevención e Intervención con la Violencia Doméstica (Ley Núm. 54). El foro apelativo ordenó la desestimación de la acusación por entender que el pliego acusatorio

era insuficiente, ya que no imputaba delito alguno. En esta ocasión nos corresponde resolver si el pliego acusatorio presentado contra el señor Pérez Feliciano era defectuoso y si afectó sus derechos sustanciales evitando así que este tuviera una defensa adecuada. Por entender que el pliego acusatorio cumple con criterios de suficiencia a la luz de nuestro ordenamiento legal, revocamos al tribunal *a quo*.

Examinemos los antecedentes fácticos que dieron génesis al presente caso.

I

El Ministerio Público presentó una denuncia contra el señor Pérez Feliciano por hechos acaecidos el 22 de abril de 2009. En esta, se le imputó haber empleado violencia física contra la Sra. Mirelsa Rosado Santiago. Se alegó, además, que el señor Pérez Feliciano le profirió palabras soeces y le escupió la cara a la dama. Celebrada la vista para la determinación de causa probable para arresto, el tribunal impuso una fianza de quince mil dólares. Subsiguientemente, el 6 de mayo de 2009 se llevó a cabo la vista preliminar en la que se determinó causa probable para acusar y se pautó el juicio para el 23 de junio de 2009. Ese mismo día, el señor Pérez Feliciano fue citado para el acto de lectura de acusación, el 26 de mayo de 2009.

La acusación presentada contra el señor Pérez Feliciano por infracción al Artículo 3.1 de la Ley Núm. 54, *supra*, expresaba lo siguiente:

> El referido acusado de epígrafe, allá para el día 21 de abril de 2009, en Manatí, Puerto Rico, que forma parte de la jurisdicción del tribunal de Primera Instancia de Puerto Rico, Sala de Arecibo; ilegal, voluntaria, maliciosa y con la intención criminal[,]empleó violencia física contra la Sra. Mirelsa Rosado Santiago, con quien ha sostenido relaciones sexuales íntimas, consistente en que le tiró una lata de cerveza en el rostro causándole una laceración, le habló palabras soeces y la escupió en la cara varias veces.[1]

Durante el juicio en su fondo, una vez concluida la presentación de la prueba de cargo, la defensa adujo que la acusación no imputaba delito alguno.[2] Sin embargo, este planteamiento no fue acogido por el foro primario y, en consecuencia, declaró culpable al señor Pérez Feliciano por el delito de maltrato según surge de la acusación. Así las cosas, el 5 de octubre de 2009, el señor Pérez Feliciano fue sentenciado a cumplir dieciocho meses en el Programa de Desvío que establece el Artículo 3.6 de la Ley Núm. 54, *supra*.

Insatisfecho con esta determinación, el 22 de octubre de 2009 el recurrido presentó un escrito de apelación ante el Tribunal de Apelaciones. Atendido el recurso apelativo, el 21 de mayo de 2010 el foro apelativo intermedio emitió una sentencia en la que revocó el fallo condenatorio dictado, que declaraba culpable al recurrido por infracción al Artículo 3.1 de la Ley Núm. 54, *supra*. En

---

[1] Petición de *certiorari*, pág. 4.
[2] Apéndice, Petición de *certiorari*, pág. 32.

virtud de ello, se ordenó la desestimación de la acusación por tratarse de un pliego acusatorio insuficiente, donde no se imputaba delito alguno. Según el tribunal recurrido, la acusación formulada contra el señor Pérez Feliciano era insuficiente, porque carecía de un elemento esencial del delito que se pretendía imputar, a saber, que se trataba de una relación consensual íntima. A tales efectos, resaltó que la acusación en pugna se limitó a alegar que las partes habían sostenido relaciones sexuales íntimas sin aducir que sostuvieron una relación afectiva consensual. El foro apelativo intermedio estableció que resolver lo contrario equivaldría a expandir la aplicación de la Ley Núm. 54 a situaciones no establecidas en esta, como lo es el caso de personas que meramente sostienen o han sostenido relaciones sexuales. Finalmente, puntualizó que el Ministerio Público tuvo oportunidad de enmendar la acusación previo a que recayera el fallo y no lo hizo.[3]

Inconforme con el curso decisorio del foro apelativo intermedio, el 10 de junio de 2010 la Procuradora General solicitó una reconsideración, pero la misma fue denegada. Esto último se notificó el 29 de julio de 2010.

Así las cosas, el 1 de septiembre de 2010 el Estado presentó ante nos un recurso de *certiorari* para la revisión de la determinación emitida por el tribunal a quo, señalando que:

---

[3] La sentencia del Tribunal de Apelaciones fue notificada el 26 de mayo de 2010. Véase, Apéndice, Petición de *certiorari*, pág. 1.

CC-2010-0762

Erró el Honorable Tribunal de Apelaciones al determinar que el pliego acusatorio era insuficiente porque no imputaba delito, toda vez que la acusación formulada contra el apelante carecía de un elemento esencial del delito que pretendía imputar, esto es que se trataba de una relación consensual íntima cuando la acusación en el presente caso se limitó a alegar que las partes habían sostenido relaciones sexuales íntimas.

El 18 de febrero de 2011 declaramos "no ha lugar" el recurso de autos por falta de jurisdicción. Oportunamente, el 1 de marzo de 2011 la Procuradora General presentó una moción de reconsideración y arguyó que ante la amenaza del huracán Earl, la Rama Judicial decretó la suspensión de trabajos el pasado 30 de agosto de 2010. A consecuencia de ello, los términos jurisdiccionales fueron extendidos y el recurso de *certiorari* debía ser considerado, ya que se presentó dentro de los términos requeridos. Examinada esta moción, decidimos declarar "con lugar" el referido petitorio el 6 de julio de 2011. Asimismo, le ordenamos al recurrido que mostrara causa por la cual no debíamos expedir el recurso y revocar la sentencia dictada por el Tribunal de Apelaciones. Contando con el beneficio de la comparecencia de ambas partes, debemos remitirnos al marco jurídico aplicable a la controversia que nos ocupa.

II

A

La violencia se ha convertido en un mal que lamentablemente afecta todos los sectores sociales de nuestro país. Sin duda, la falta de reconocimiento de la dignidad del ser humano nos ha conducido por un camino

oscuro y confuso donde el valor de la persona se ha supeditado a otros intereses de inferior categoría. Particularmente, en el contexto de las relaciones de pareja, la pérdida de respeto hacia la persona ha resultado en la comisión de crímenes desgarradores que día a día perturban la sana convivencia familiar y social de nuestro pueblo.

Como bien expresa la Exposición de Motivos de la Ley Núm. 54, "[l]a violencia doméstica es un comportamiento antisocial que constituye un serio problema para la familia puertorriqueña.... Tolerar la violencia doméstica hoy contribuye a la desintegración de la familia, a fomentar la criminalidad y al debilitamiento de los valores de la convivencia humana."[4]

Específicamente, el Artículo 1.3(p) de la Ley Núm. 54 define violencia doméstica como sigue:

> [U]n patrón de conducta constante de empleo de fuerza física o violencia psicológica, intimidación o persecución contra una persona por parte de su cónyuge, ex cónyuge, una persona con quien cohabita o haya cohabitado, con quien sostiene o haya sostenido una relación consensual o una persona con quien se haya procreado una hija o un hijo, para causarle daño físico a su persona, sus bienes o a la persona de otro o para causarle grave daño emocional. 8 L.P.R.A. sec. 602(p).

Debido a que la víctima se encuentra ligada íntima y emocionalmente a su agresor y está igualmente sujeta a episodios cíclicos de violencia física, emocional y psicológica, la violencia en la relación de pareja posee

---

[4] 1989 Leyes de Puerto Rico 222

CC-2010-0762

características distintivas de otros tipos de violencia.[5] Ante esta realidad, debemos reafirmar de manera contundente la política contra la violencia doméstica. De este modo aseguramos que los instrumentos sustantivos y procesales provistos por la Ley Núm. 54, se apliquen de manera rigurosa y eficaz.

La política pública contra la violencia doméstica repudia enérgicamente esta conducta por ser contraria a los valores de paz, dignidad y respeto que este pueblo desea mantener para las personas, las familias y la comunidad en general. Ley Núm. 54, *supra*. Conforme a estos propósitos, este Tribunal ha apuntalado en varias ocasiones que la violencia doméstica "es un mal endémico y una infamia repudiable que aqueja a la sociedad contemporánea. Si algo ha de quedar claro es la política pública en su contra, consagrada en la Ley para la Prevención en Intervención con la Violencia Doméstica". Pueblo v. Carmen Figueroa Santana, 154 D.P.R. 717, 723 (2001); Véase, San Vicente v. Policía de P.R., 142 D.P.R. 1, 2(1996).

A estos efectos, las manifestaciones de violencia se encuentran tipificadas como delitos en la Ley Núm. 54. El Artículo 3.1 del citado estatuto tipifica el delito de "maltrato", el cual sanciona la utilización de fuerza física, de violencia psicológica, de intimidación o de persecución contra la persona con la que se sostiene o se ha sostenido una relación de pareja para causarle daño

---

[5] Véase Memorial Explicativo sobre el P. de la C. 615 y P del S. 470.

físico o emocional, o daño a sus bienes. Este precepto define maltrato de la manera siguiente:

> Toda persona que empleare fuerza física o violencia psicológica, intimidación o persecución en la persona de su cónyuge, ex cónyuge, o la persona con quien cohabita o haya cohabitado, o la persona con quien sostuviere o haya sostenido una relación consensual, o la persona con quien haya procreado un hijo o hija, para causarle daño físico a su persona, a los bienes apreciados por ésta, excepto aquellos que pertenecen privativamente al ofensor, o a la persona de otro o para causarle grave daño emocional .... 8 L.P.R.A. sec. 631.

Al interpretar la referida disposición legislativa, en Pueblo v. Roldán López, 158 D.P.R. 54, 57 (2002), este Tribunal determinó que los elementos del delito de maltrato son los siguientes:

> (1) empleo de fuerza física o violencia psicológica, intimidación o persecución;
> (2) contra una persona que haya sido cónyuge del agresor o agresora, o con quien haya convivido, sostenido una relación consensual, o procreado hijos; y
> (3) que la fuerza o violencia se haya efectuado para causar daño físico a esa persona o sus bienes.

En el intento de combatir esta conducta tan nociva a la dignidad humana, debemos esforzarnos por lograr que esta no pase desapercibida y por que la víctima tome las medidas necesarias para evitar tragedias mayores. Pueblo v. Figueroa Santana, supra. Así, al interpretar las disposiciones de la Ley Núm. 54, debemos tener presente los principios y propósitos sociales que promovieron su aprobación sin desligarnos de la realidad y del problema humano que la norma persigue atender. Pueblo v. Figueroa Santana, supra. Véanse, también: Pueblo v. Zayas Rodríguez,

CC-2010-0762

147 D.P.R. 530 (1999); Col. Ing. Agrim. P.R. v. A.A.A., 131 D.P.R. 735 (1992).

Cónsono con lo anterior, reiteramos que el propósito de la Ley Núm. 54, es un corolario del interés apremiante del Estado de disuadir a sus miembros de incurrir en actos violentos y de modificar los patrones de conducta tan lesivos a la persona que están arraigados en nuestro pueblo. Pueblo v. Rodríguez Velázquez, 152 D.P.R. 192 (2000); Pueblo v. Rivera Morales, 133 D.P.R. 444 (1993). Restarle importancia a este tipo de crímenes agravaría un ya ingente problema social. Pueblo v. Rodríguez Velázquez, supra; Pueblo v. Esmurria Rosario, 117 D.P.R. 884 (1986).

B

La Quinta Enmienda de la Constitución de Estados Unidos[6] reconoce que ninguna persona "será privada de su libertad o de su propiedad, sin el debido procedimiento de ley". De igual manera, nuestra Constitución establece este derecho en la Sec. 7 del Art. II.[7] Así, en virtud del debido proceso de ley, tanto la Enmienda Sexta[8] de la Constitución federal como la Sección 11 del Artículo II de nuestra Carta Magna[9] consagran el derecho de todo acusado a ser notificado de la causa de acción en su contra. No obstante, en nuestra jurisdicción, este derecho se

---

[6] Const. EE. UU., L.P.R.A., Tomo 1. ed. 2008, pág. 189.
[7] Const. E.L.A., L.P.R.A., Tomo 1.
[8] Const. EE. UU., *supra*.
[9] Const. E.L.A., *supra*.

complementa con la obligación del Estado de entregar al acusado una copia del pliego acusatorio.[10]

En lo pertinente a este principio, el Estado cumple con el deber de informar adecuadamente al acusado a través de la acusación, la cual luego servirá de base a las alegaciones y los procedimientos posteriores, incluyendo el juicio. E.L. Chiesa Aponte, <u>Derecho procesal penal de Puerto Rico y Estados Unidos</u>, Colombia, Tercer Mundo Editores, 1993, Vol. III, págs. 140-141. A estos efectos, la Regla 35 de Procedimiento Criminal, 34 L.P.R.A. Ap. II R. 35, provee los datos que deberá tener una acusación conforme a los estándares de una notificación adecuada. En particular, el inciso (c) de la mencionada regla exige que la acusación deberá contener lo siguiente:

> Una exposición de los hechos esenciales constitutivos del delito, redactada en lenguaje sencillo, claro y conciso, y de tal modo que pueda entenderla cualquier persona de inteligencia común. Las palabras usadas en dicha exposición se interpretarán en su acepción usual en el lenguaje corriente, con excepción de aquellas palabras y frases definidas por ley o por la jurisprudencia, las cuáles se interpretarán en su significado legal. Dicha exposición, no tendrá que emplear estrictamente las palabras usadas en la ley, y podrá emplear otras que tuvieren el mismo significado. Regla 35 de Procedimiento Criminal, *supra*.

Conforme a la doctrina establecida, al analizar si se satisface el mandato constitucional de la debida notificación, lo esencial es que el contenido de la acusación exponga todos los hechos constitutivos del tipo delictivo, de forma que cualquier acusado de inteligencia

---

[10] Id.

mediana pueda, en efecto, entender de qué se le acusa. Pueblo v. Montero Luciano, supra; Pueblo v. Calviño Creijo, 110 D.P.R. 691, 694 (1981). Para cumplir con este requisito constitucional, la precitada regla no exige que la acusación siga fielmente las palabras de la ley, tampoco es necesario que el Estado emplee un lenguaje "talismánico o estereotipado", pues su propósito no es "cumplir mecánicamente con un ritual", sino informar al acusado sobre el delito que se le imputa. Pueblo v. Calviño Cereijo, supra; Pueblo v. Meléndez Cartagena, 106 D.P.R. 338, 341 (1977). Se colige entonces que si en la acusación algún elemento esencial fue imputado sin emplear las mismas palabras que utilizó el legislador, esto no provocará su insuficiencia si el acusado puede comprender de qué se le está acusando y no se afecta su defensa.

Sin embargo, cuando las alegaciones contenidas en el pliego acusatorio no imputan delito alguno bajo las leyes penales de Puerto Rico, procede la desestimación por insuficiencia del pliego acusatorio. Regla 64(a) de Procedimiento Criminal, 34 L.P.R.A. Ap. II; Chiesa Aponte, op. cit. De esta forma, una moción de desestimación bajo el fundamento de que la acusación no imputa delito se convierte en un mecanismo procesal para objetar la suficiencia de los cargos presentados en el pliego acusatorio. O.E. Resumil de Sanfilippo, Práctica jurídica de Puerto Rico: derecho procesal penal, New Hampshire, Butterworth Legal Publishers, 1993, Vol. 2, pág. 10. Esta

moción puede ser presentada en cualquier etapa del procedimiento criminal, toda vez que posee un carácter privilegiado. Regla 63 de Procedimiento Criminal, 34 L.P.R.A. Ap. II.

Por su parte, la Regla 36 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, establece lo relacionado a los defectos de forma y dispone que "una acusación o denuncia no será insuficiente … por causa de algún defecto, imperfección u omisión de forma que no perjudi[que] los derechos sustanciales del acusado". Por lo tanto, "**si el defecto no ocasiona que el pliego acusatorio sea insuficiente ni que el imputado sufra un perjuicio sustancial en cuanto a su oportunidad de defenderse, entonces se trata de un defecto de forma y por ende el pliego acusatorio puede ser enmendado en cualquier momento**". (Énfasis nuestro.) Chiesa Aponte, op. cit. pág. 173. Tanto es así, que dado el caso en que no se solicite la enmienda, el pliego que adolece de algún defecto de forma se entenderá subsanado una vez rendido el veredicto del Jurado o el fallo del tribunal. Regla 38(a) de Procedimiento Criminal, 34 L.P.R.A. Ap. II.

A diferencia de los defectos u omisiones de forma, un defecto sustancial es aquel que afecta los derechos sustanciales del acusado, bien porque le impide preparase adecuadamente para su defensa o porque sencillamente, tiene el efecto de insuficiencia del pliego acusatorio. Pueblo v. Meléndez Cartagena, supra; Chiesa Aponte, op.

cit., pág. 174. En esta determinación, son materia sustancial todos los hechos que necesariamente deben ser probados para hacer del acto un delito. Pueblo v. González, 97 D.P.R. 541 (1969). Es decir, la acusación debe incluir todos los elementos del delito, de lo contrario será insuficiente y sufrirá de un defecto sustancial. Pueblo v. Díaz Breijo, 97 D.P.R. 64 (1969). No obstante, el tribunal puede permitir enmiendas para añadir hasta un elemento esencial del delito imputado antes de la convicción o absolución del acusado. Rabell Martínez v. Tribunal, *supra*; O.E. Resumil de Sanfilippo, op. cit., pág. 155. De ser este el caso, el acusado tendrá derecho a que se le celebre nuevamente el acto de lectura de la acusación. Regla 38(b) de Procedimiento Criminal, 34 L.P.R.A. Ap. II.

A estos efectos, es imperativo reiterar que en la consideración de si el pliego acusatorio aduce de manera satisfactoria los hechos constitutivos de delito, "no se exigirá que se alegue con perfección de artífice" todos los elementos de la conducta punible. Pueblo v. Rodríguez López, 96 D.P.R. 690 (1968). Véase, también, O.E. Resumil de Sanfilippo, op. cit., pág. 10. Es preciso señalar que, en conformidad a las normas de interpretación que aseguran un procedimiento justo, sin dilaciones y sin gastos injustificados, a la luz de la Regla 35 de Procedimiento Criminal, *supra*, este Tribunal ha avalado una interpretación liberal al analizar la suficiencia del

pliego acusatorio. Reglas 1 y 35 de Procedimiento Criminal, 34 L.P.R.A. Ap. II; Pueblo v. Feliecer Villalongo, 105 D.P.R. 600 (1977).

III

En el caso de autos, el Ministerio Público señala que el Tribunal de Apelaciones incidió al revocar el dictamen de culpabilidad del foro primario contra el Sr. Eligio Pérez Feliciano. Específicamente, aduce que erró al determinar que el pliego acusatorio era insuficiente toda vez que carecía de un elemento esencial del delito de maltrato según tipificado en el referido Artículo 3.1 de la Ley Núm. 54, al limitarse a alegar que las partes habían sostenido **relaciones sexuales íntimas**, en vez de imputar que se trataba de una **relación consensual íntima**.

Según se desprende de la exposición del derecho, el propósito esencial del pliego acusatorio, en conformidad al debido proceso de ley, es notificar adecuadamente al acusado del delito por el cual va a ser procesado. En el caso de marras, el pliego acusatorio contra el señor Pérez Feliciano alegaba que este empleó violencia física contra la Sra. Mirelsa Rosado Santiago, persona con quien ha sostenido relaciones sexuales íntimas. Los actos de violencia según imputados, consistían en que el convicto le tiró una lata de cerveza en el rostro causándole una laceración, le habló palabras soeces y escupió en la cara varias veces a la dama.

De los hechos consignados en la acusación obtenemos las alegaciones de que el recurrido empleó fuerza física y violencia psicológica contra la señora Rosado. En particular, en la acusación no se específica el lenguaje exacto utilizado, según establecido en la Ley Núm. 54, *supra*, que la señora hubiera sido cónyuge del recurrido, que hubiese procreado hijos con el agresor o que hubiese sostenido una relación consensual íntima con este.

La controversia del caso ante nos se basa en que el Ministerio Público, al establecer este elemento del delito de maltrato, utilizó las palabras "relación sexual íntima". Si bien es cierto que el pliego acusatorio no siguió fielmente las palabras de la ley, leída e interpretada racional y razonablemente a la luz de la norma de hermenéutica establecida en la Regla 35(c) de Procedimiento Criminal, *supra*, colegimos que dentro de las circunstancias de este caso específico, se exponen los elementos esenciales del delito del maltrato de la Ley Núm. 54.

Estamos llamados a interpretar las leyes según su espíritu y en armonía con el propósito social que estas aspiran cumplir. Pueblo v. Figueroa Santana, supra. No cabe la menor duda que el propósito de las alegaciones del pliego que hacen referencia a que entre el recurrido y la señora Rosado hubo "relaciones sexuales íntimas", fue expresar que entre ellos existía una "relación consensual íntima" conforme a las definiciones provistas por el

legislador en la Ley Núm. 54, *supra*. Una persona de inteligencia promedio, a la luz de las alegaciones provistas en el pliego acusatorio contra el señor Pérez Feliciano, podría entender cabalmente y sin mayor dificultad que se trataba de una acusación por el delito de maltrato. Entendemos que el requisito constitucional de adecuada notificación al acusado fue debidamente satisfecho y no había una confusión sobre si dentro de las circunstancias particulares del caso existía, en efecto, una relación consensual. Dentro de la interpretación en cuanto al lenguaje utilizado en la imputación de delito, debemos concluir que en este caso se consignaron los elementos del delito, de forma que fueron suficientes para notificar al señor Pérez Feliciano de la naturaleza y de la causa de acción en su contra. Como consecuencia de ello, el recurrido disfrutó sin menoscabo alguno su derecho a un debido proceso de ley.

Más aún, según se desprende de la transcripción de la prueba oral estipulada surgida del juicio celebrado el 9 de noviembre de 2009, se estableció que la pareja mantuvo un noviazgo. En lo pertinente, en el examen directo a la víctima, la transcripción expresa lo siguiente:

FISCAL: Le pregunto, ¿si usted conoce a Eligio Pérez Feliciano?

TESTIGO: Sí, lo conozco.

Fiscal: ¿Por razón de qué o qué tipo de relación había entre ustedes?

TESTIGO: Como novios o casi novios.

FISCAL: ¿Convivían?

GONZÁLEZ: Objeción a la sugestividad, Juez.

FISCAL: ¡Ah!

TESTIGO: No, yo me quedaba a veces en la casa de él.

FISCAL: ¿Cuántas veces?

TESTIGO: Casi todas las semanas, a veces cuatro días, depende porque yo trabajo.

FISCAL: ¿Y él en la suya cuántas veces se quedaba?

GONZÁLEZ: Objeción. Es sugestivo, Juez.

JUEZ. ¡Bendito sea Dios! ¿Convivían, se acostaban?

Testigo: Sí.

Juez: Pues ya.

Fiscal: Le pregunto, ¿hace cuánto tiempo usted lo conoce a él?

TESTIGO: Hace tre… más o … bueno hace tres años ahora vamos a cumplir cuatro.[11]

El Tribunal de Primera Instancia le rindió total credibilidad a la prueba desfilada durante el juicio contra el señor Pérez Feliciano. Al así hacerlo, encontró culpable al recurrido más allá de toda duda por su infracción al delito de maltrato según tipificado en el Artículo 3.1 de la Ley Núm. 54, *supra*. Dentro de la función revisora de los dictámenes de los foros de instancia, es pertinente apuntalar la norma de Pueblo v. Colón, Castillo, 140 D.P.R. 564, 581-582 (1996), donde expresamos:

---

[11] Véase Apéndice de la Petición de *certiorari,* pág. 18.

> Como primer paso a una determinación de suficiencia [de prueba], el tribunal ha de cerciorarse que el Ministerio Público haya aducido … todos los elementos del delito imputado…. También se exige que la evidencia conecte al acusado con los delitos imputados, una función eminentemente propia del juzgador de la credibilidad. Dentro de la responsabilidad del tribunal de examinar la suficiencia, éste ha de asegurarse de que la prueba de cargo sea una que, de ser creída, pueda conectar al acusado con el delito imputado….

Antes de dictar el fallo de culpabilidad, el foro de instancia interpretó la Regla 35(c) de Procedimiento Criminal, *supra*, y no encontró ningún defecto sustancial en el pliego acusatorio. Ello porque se comprendía que el término "relación sexual íntima" en el contexto del caso de autos y en conjunto con el resto de las alegaciones del pliego acusatorio, se refería a "relación consensual íntima". La actuación del Ministerio Público de no haber expresado a "perfección de artífice" que se trataba de una "relación consensual íntima" y no meramente una "relación sexual íntima" no invalida la acusación. Véase, Pueblo v. Rodríguez López, supra. No observamos un ápice de que el señor Pérez Feliciano se vio afectado o impedido de comprender de qué se le acusaba. De ninguna manera podemos avalar la invitación que nos hace el convicto para declarar que la acusación sufre de un defecto sustancial.

Además, conviene distinguir los hechos de este caso de aquellos que atendimos en Pueblo v. Flores Flores, res. el 23 de marzo de 2011, 2011 T.S.P.R. 38. 2011 J.T.S. 43, 181 D.P.R. ___ (2011). Allí, por estar divididos, emitimos una Sentencia mediante la cual confirmamos el dictamen del

Tribunal de Apelaciones. En aquel entonces, el Juez Asociado señor Kolthoff Caraballo emitió una Opinión de Conformidad a la que se unieron los Jueces Asociados señor Martínez Torres y señora Pabón Charneco. En ella, se expuso en esencia que la Ley Núm. 54, supra, no aplica a relaciones adúlteras, por lo que procedía desestimar la acusación contra el acusado. Sin embargo, se indicó expresamente que "en el caso de la relación consensual ésta puede entenderse por la de novios que sin convivir pueden llegar a mantener una relación afectiva". Pueblo v. Flores Flores, supra, págs. 24-25. Precisamente, eso es lo que ocurre en el caso que nos ocupa.

A la luz del análisis de los hechos y del estado de derecho esbozados, concluimos que no estamos ante un problema de suficiencia del pliego acusatorio por causa de un error sustancial. Los actos expuestos en la acusación fueron suficientes a los efectos de indicar de manera inteligible los elementos de la conducta prohibida por el Artículo 3.1 de la Ley Núm. 54, supra. Debemos destacar que dichos elementos fueron probados y que el recurrido fue hallado culpable más allá de toda duda razonable por el foro primario, luego de evaluar la totalidad de la prueba presentada en el juicio. Por ello, es forzoso colegir que el Tribunal de Apelaciones cometió el error señalado.

IV

Por los fundamentos expuestos, se expide el auto de *certiorari* solicitado y se revoca la sentencia dictada por el Tribunal de Apelaciones. En consecuencia, se reinstala el fallo condenatorio emitido por el Tribunal de Primera Instancia contra el señor Pérez Feliciano por infracción al Artículo 3.1 de la Ley Núm. 54.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Fiol Matta emitió Opinión Concurrente a la cual se unió el Juez Presidente señor Hernández Denton. La Juez Asociada señora Rodríguez Rodríguez emitió Opinión Concurrente y Disidente. El Juez Asociado señor Martínez Torres emitió Opinión de Conformidad a la cual se unió el Juez Asociado señor Kolthoff Caraballo y la Jueza Asociada señora Pabón Charneco. El Juez Asociado señor Rivera García emitió Opinión de Conformidad a la cual se unió el Juez Asociado señor Feliberti Cintrón.

Lcda. Larissa Ortiz Modestti
Secretaria Tribunal Supremo, Interina

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

           v.

                      CC-2010-762

Eligio Pérez Feliciano

    Recurrido

Opinión concurrente emitida por la Jueza Asociada señora FIOL MATTA a la cual se une el Juez Presidente señor HERNÁNDEZ DENTON

En San Juan, Puerto Rico, a 16 de diciembre de 2011.

Con la Sentencia que emite el Tribunal en este caso, se rechaza una interpretación irrazonablemente restrictiva sobre el concepto de "relación consensual" que hubiese tenido el efecto de desestimar una acusación por el delito de maltrato entre pareja, tipificado en la Ley para la Prevención e Intervención con la Violencia Doméstica, Ley 54 de 1989.[12] Estoy de acuerdo con ese resultado.

---

[12] Art. 3.1, Ley para la Prevención e Intervención con la Violencia Doméstica, Ley Núm. 54-1989, 8 L.P.R.A. sec. 631.

I

El Tribunal de Primera Instancia, correctamente, descartó el planteamiento de la defensa sobre insuficiencia del pliego acusatorio y encontró culpable al acusado por el delito de maltrato entre pareja. El Tribunal de Apelaciones revocó el fallo condenatorio al entender que la determinación de culpabilidad se asentó en una acusación que carecía de un elemento esencial del delito de maltrato bajo la Ley 54: que el acusado mantenía una relación consensual con la perjudicada. Según el foro apelativo, aunque las relaciones sexuales pueden ser un elemento de una relación consensual íntima, "las meras relaciones sexuales no constituyen, por sí solas, una relación afectiva como la que se quiso proteger bajo la Ley 54".[13] Por eso, a pesar de que en la acusación se alegaba que las partes habían sostenido relaciones sexuales íntimas, resolvió que ello no equivalía a mantener la relación consensual que la Ley 54 requiere.[14] La

---

[13] Sentencia del Tribunal de Apelaciones, Pueblo v. Pérez Feliciano, KLAN 2009 01460, 21 de mayo de 2010 (panel integrado por los jueces Aponte Hernández y Cabán García y la jueza Cintrón Cintrón), pág. 7, Certiorari, pág. 9 del Apéndice.

[14] Llama la atención que la Sentencia del foro apelativo basa esta aseveración en una frase contenida en Pueblo v. Ruiz, 159 D.P.R. 194 (2003). Véase Sentencia del Tribunal de Apelaciones, supra, págs. 6-7, Certiorari, págs. 8-9 del Apéndice. En la argumentación sobre la determinación de excluir a las parejas homosexuales de la protección de la Ley 54 que se hizo en ese caso, se utilizó el término "relación afectiva" como parte de la explicación de lo que es una "relación consensual". Nos parece pertinente

Procuradora General solicitó que revocáramos esa sentencia. Así lo hacemos en la Sentencia emitida en el día de hoy.

II

Según se desprende del expediente del caso, la señora Mirelsa Rosado Santiago buscó en su carro a su pareja, el señor Eligio Pérez Feliciano, para ir a la playa. De regreso de la playa, la señora Rosado Santiago se detuvo en el negocio de un familiar y, cuando estaba conversando con él, el señor Pérez Feliciano se bajó del carro para apurarla, la haló por el brazo y se volvió a montar en el vehículo. Al ella acercarse al auto, el señor Pérez Feliciano le tiró con una lata de cerveza, que le dio en la nariz.[15] La mujer le dijo al señor Pérez Feliciano que se bajara de su carro, pero él le pidió que lo llevara a su casa. De camino, la escupió en la cara en diversas ocasiones. Luego de dejarlo en su hogar, la señora Rosado

---

aclarar que esa discusión no tuvo el efecto de enmendar la Ley 54 para añadir un nuevo requisito subjetivo de afectividad a las relaciones consensuales que protege esta legislación.

[15] *Véase* Alegato del Apelante ante el Tribunal de Apelaciones, 3 de febrero de 2010. El señor Pérez Feliciano narra que lo que ocurrió fue que "una pareja estaba disfrutando y compartiendo en la playa", se detuvieron en un negocio a comprar bebidas alcohólicas y él le lanzó una lata a la mujer porque no le hizo caso a su petición de marcharse del lugar. *Id.*, a las págs. 17-18, *Certiorari*, págs. 61-62 del Apéndice (énfasis suplido).

Santiago se sentía nerviosa y acudió al cuartel para denunciar a su pareja.

Al señor Pérez Feliciano se le imputó haber violado el artículo 3.1 de la Ley 54. El pliego acusatorio lee así:

> El referido acusado de epígrafe, allá para el día 21 de abril de 2009, en Manatí, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia de Puerto Rico, Sala de Arecibo; ilegal, voluntaria, maliciosa y con la intención criminal, empleó violencia física contra la Sra. Mirelsa Rosado Santiago, con quien ha sostenido relaciones sexuales íntimas, consistentes en que le tiró una lata de cerveza en el rostro causándole una laceración, le habló palabras soeces y la escupió en la cara varias veces.[16]

En el juicio, testificaron la agente que tomó la querella de violencia doméstica y la víctima. Del interrogatorio a la perjudicada se desprende claramente el tipo de relación que tenían la señora Rosado Santiago y el señor Pérez Feliciano: estaban próximos a cumplir cuatro años de novios y ella se quedaba a dormir en casa de él casi todas las semanas, hasta cuatro días por semana.[17]

### III

La Ley 54 se creó para proteger a las personas, y especialmente a las mujeres, que sufrieran maltratos

---

[16] *Véase* Sentencia del Tribunal de Apelaciones, *supra*, pág. 6, *Certiorari*, pág. 8 del Apéndice (énfasis suplido).

[17] Transcripción de la prueba oral estipulada, págs. 6-7, *Certiorari*, págs. 24-25 del Apéndice. La cita directa de la transcripción se encuentra en la Sentencia del Tribunal Supremo, págs. 16-17.

físicos o emocionales "a manos de una persona con quien sostiene o ha sostenido una _relación íntima_".[18] La intención de la Ley era responder al alto índice de este tipo de casos en Puerto Rico, atendiendo las particularidades que presenta la violencia de pareja. A esos efectos, se incluyó el artículo 3.1, que tipifica el delito de maltrato de pareja:

> Toda persona que empleare fuerza física o violencia psicológica, intimidación o persecución en la persona de su cónyuge, ex cónyuge o la persona con quien cohabita o haya cohabitado, o la persona con quien sostuviere o haya sostenido una _relación consensual_, o la persona con quien haya procreado un hijo o hija, para causarle daño físico a su persona, a los bienes apreciados por ésta, excepto aquellos que pertenecen privativamente al ofensor, o a la persona de otro o para causarle grave daño emocional, incurrirá en delito grave de cuarto grado en su mitad superior. El tribunal podrá imponer pena de restitución, además de la pena de reclusión establecida.[19]

Para propósitos de la Ley 54, una relación consensual existe cuando dos personas aceptan de manera voluntaria compartir como pareja, sin que necesariamente cohabiten ni se hayan casado o procreado hijos en común.[20] Es innegable

---

[18] Exposición de Motivos, Ley Núm. 54-1989 (énfasis suplido).

[19] 8 L.P.R.A. sec. 631 (énfasis suplido). Basta una sola agresión mediante el uso de fuerza física de cualquier grado para que una persona pueda ser convicta bajo el artículo 3.1 de la Ley 54. _Pueblo v. Roldán López_, 158 D.P.R. 54, 57-58 (2002); _Pueblo v. Figueroa Santana_, 154 D.P.R. 717, 726 (2001).

[20] Véase la Opinión disidente en _Pueblo v. Flores Flores_, 2011 T.S.P.R. 38.

que el señor Pérez Feliciano y la señora Rosado Santiago mantenían una relación de esa naturaleza, y dentro de esa relación consensual ocurrió el maltrato.

La palabra consensual implica consentimiento. Una relación sexual entre personas mayores de edad, por definición, tiene que ser consentida. De no serlo, quien haya compelido al acto, ya sea mediante violencia, intimidación, engaño o uso de sustancias que impidan el consentimiento, incurre en el delito de agresión sexual.[21] Una relación consensual de pareja no tiene que incluir actos sexuales para ser considerada como tal,[22] pero el hecho de que dos personas decidan voluntariamente sostener relaciones sexuales de manera habitual no puede sino abonar a la conclusión de que existe una relación consensual íntima entre ellos. Por otra parte, no tiene sentido pensar que, sólo porque se utilizó el término "relaciones sexuales íntimas" en la acusación, en vez del término "relaciones consensuales íntimas", el señor Pérez Feliciano no quedó debidamente avisado de que se le estaba acusando de haber incurrido en maltrato dentro de su

---

[21] *Véase* Art. 142, Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4770.

[22] En casos de divorcio por separación, hemos establecido que la ausencia de relaciones sexuales, cuando las partes se comportan como una pareja en otros aspectos, no implica la inexistencia del vínculo (Cosme v. Marchand, 121 D.P.R. 225, 236-238 (1988)), como tampoco un acto sexual aislado significa que existe una relación de pareja (Rosario v. Galarza, 83 D.P.R. 167 (1961)).

relación íntima de pareja con la señora Rosado Santiago, y que, por ello, podía ser castigado a tenor con la Ley 54. Viene a la memoria, muy a propósito, la advertencia que nos hiciera el juez asociado Raúl Serrano Geyls hace muchos años: "Los jueces no debemos, después de todo, ser tan inocentes como para creer declaraciones que nadie más creería".[23]

## IV

El propósito del pliego acusatorio es informar al acusado cuál es el delito que se le imputa para que pueda preparar su defensa adecuadamente.[24] En Pueblo v. Santiago Cedeño, explicamos que "[l]o fundamental es que la acusación consigne los elementos del delito imputado en forma que constituya debida notificación de la naturaleza y causa de los cargos".[25] Por eso, no se le exige al Ministerio Público que utilice un lenguaje "técnico o talismánico" para anunciarle al imputado de qué se le

---

[23] Pueblo v. Luciano Arroyo, 83 DPR 573, 582 (1961).

[24] Pueblo v. Meléndez Cartagena, 106 D.P.R. 338, 340-341 (1977). En este caso, señalamos que la acusación no es insuficiente por no incluir fielmente y de forma mecánica las palabras de la ley.

[25] Pueblo v. Santiago Cedeño, 106 D.P.R. 663, 666 (1978). Véanse también Pueblo v. Rivera Rivera, 145 D.P.R. 366, 378 (1998); Pueblo v. González Olivencia, 116 D.P.R. 614, 617-618 (1985).

acusa.[26] La Regla 35(c) de las de Procedimiento Criminal requiere que la acusación contenga:

> Una exposición de los hechos esenciales constitutivos del delito redactada en lenguaje sencillo, claro y conciso, y de tal modo que pueda entenderla cualquier persona de inteligencia común. Las palabras usadas en dicha exposición se interpretarán en su acepción usual en el lenguaje corriente, con excepción de aquellas palabras y frases definidas por ley o por la jurisprudencia, las cuales se interpretarán en su significado legal. Dicha exposición no tendrá que emplear estrictamente las palabras usadas en la ley, y podrá emplear otras que tuvieran el mismo significado. En ningún caso será necesario expresar en la acusación o denuncia presunciones legales ni materias de conocimiento judicial.[27]

Como expresa el profesor Ernesto Chiesa, "una acusación no es insuficiente porque algún elemento esencial de la acusación fue imputado sin emplear expresamente las palabras que utilizó el legislador para ese elemento".[28] La suficiencia del pliego acusatorio se evalúa de forma liberal, porque lo que importa no es el lenguaje con que está redactado sino que informe debidamente del delito por el cual se acusa.[29] Por tanto, el derecho constitucional del acusado a ser notificado de

---

[26] Pueblo v. Calviño Cereijo, 110 D.P.R. 691, 693-694(1981).

[27] 34 L.P.R.A. Ap. II, R. 35(c) (énfasis suplido).

[28] E. L. Chiesa Aponte, Derecho Procesal Penal de Puerto Rico y Estados Unidos, Colombia, Forum, 1993, Vol. III, pág. 149. Véanse también las páginas 143-148.

[29] Pueblo v. Villafañe, Contreras, 139 D.P.R. 134, 149-151 (1995).

la naturaleza y causa de la acusación y a recibir copia de la misma[30] no se viola cuando el pliego acusatorio no incluye textualmente las disposiciones de la ley que se alega que se ha infringido, pero sí contiene un lenguaje que da aviso suficiente sobre los hechos y los elementos del delito cuya violación se imputa.[31]

Una persona de inteligencia común puede comprender que se le está acusando de incurrir en violencia doméstica contra la persona con quien mantiene una relación consensual cuando en el pliego acusatorio se le indica que agredió a la persona "con quien ha sostenido relaciones sexuales íntimas" y esta frase se encuentra junto al nombre de quien ha sido su pareja por más de tres años, a quien maltrató el día anterior. El Ministerio Público indicó en su recurso que nunca enmendó la acusación para especificar que el acusado y la víctima mantenían una relación consensual porque juzgó, correctamente, que tal subsanación no era necesaria dado que el pliego acusatorio, tal como estaba redactado, consignaba los

---

[30] Const. P.R., Art. II sec. 11. Este derecho también es reconocido por la Sexta Enmienda de la Constitución de Estados Unidos.

[31] Pueblo v. Narváez Narváez, 122 D.P.R. 80, 87-88 (1988); Chiesa, *supra*, a la pág. 169. Una exposición sencilla de los hechos esenciales constitutivos del delito es suficiente para cumplir con la normativa del debido proceso de ley. Pueblo v. Flores Betancourt, 124 D.P.R. 867, 883 (1989).

elementos del delito y notificaba debidamente al acusado sobre los cargos presentados.[32]

No cabe duda que en este caso el pliego acusatorio cumplió el propósito de informarle al señor Pérez Feliciano por qué se le estaba acusando. La acusación incluyó todos los elementos constitutivos del delito de maltrato de pareja en un lenguaje claro y corriente, entendible por una persona de inteligencia común. En el hecho de que el acusado agredió a la víctima al lanzarle con la lata y escupirla estaba presente en la acusación el empleo de fuerza física e intimidación para causar daño, y estaba presente el que la víctima era una persona con quien el acusado había mantenido una relación consensual en el hecho de haber sostenido con ésta "relaciones sexuales íntimas". El uso de la frase "ha sostenido relaciones sexuales íntimas" fue suficiente para identificar a la perjudicada como la persona con quien el señor Pérez Feliciano mantenía una relación consensual de intimidad protegida por la Ley 54. No era indispensable que las palabras "relaciones" e "íntimas" fueran acompañadas por la palabra "consensuales" para que el acusado supiera que se le imputaba haber cometido un acto violento contra su pareja, castigable de acuerdo con el artículo 3.1 de la Ley 54. No se puede llevar el requisito

---

[32] Petición de *Certiorari*, págs. 19-20. Véase la Regla 38 de las de Procedimiento Criminal, sobre subsanación de la acusación. 34 L.P.R.A. Ap. II, R. 38.

de especificidad de la acusación más allá de lo que el derecho exige.

Ciertamente, es nuestro deber proteger los derechos de los acusados y garantizar un debido proceso de ley. Pero, en el cumplimiento de ese deber, no debemos proceder de manera irrazonable, y menos aún ante el embate de violencia machista que aqueja al País. Por todo lo anterior, estoy de acuerdo con la decisión de revocar la determinación del Tribunal de Apelaciones y reinstalar el fallo condenatorio del Tribunal de Primera Instancia que enuncia este Tribunal en su Sentencia.


                                        Liana Fiol Matta
                                        Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Pueblo de Puerto Rico<br><br>    Peticionario<br><br>        v.<br><br>Eligio Pérez Feliciano<br><br>    Recurrido | CC-2010-762 |

Opinión Concurrente y Disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 16 de diciembre de 2011

Concurro con la determinación de este Tribunal de rechazar la interpretación rígida y formalista esgrimida por el foro apelativo intermedio sobre el delito de maltrato entre pareja tipificado en la Ley para la Prevención e Intervención con la Violencia Doméstica, Ley núm. 54 de 15 de agosto de 1989 ("Ley 54"). En consecuencia, procede, como se dictamina, reinstalar el fallo emitido por el Tribunal de Primera Instancia.

                            I

En el caso de epígrafe el Tribunal de Apelaciones revocó el fallo condenatorio del recurrido porque concluyó que el pliego acusatorio presentado era insuficiente al carecer de unos de los elementos del delito maltrato según

dispuesto en la Ley 54.[33]  El Tribunal de Apelaciones sostuvo que la fiscalía erró al alegar en la acusación que "las partes habían sostenido relaciones sexuales íntimas",[34] cuando debió haber dicho que se trataba de "una relación consensual íntima", por exigencia, supuestamente, del Art. 3.1 de la Ley 54.  Bajo este fundamento el foro apelativo revocó la condena del acusado.

En *Pueblo v. Roldán*, 158 DPR 54 (2002) determinamos que los elementos del delito tipificado en el Art. 3.1 eran los siguientes:  primero, el empleo de fuerza física o violencia psicológica, intimidación o persecución; segundo, empleo de fuerza contra una persona que haya sido

---

[33] El Art. 3.1 de la Ley 54 define el delito de maltrato de la siguiente manera:

> Toda persona que empleare fuerza física o violencia psicológica, intimidación o persecución en la persona de su cónyuge, ex cónyuge, o la persona con quien cohabita o haya cohabitado, **o la persona con quien sostuviere o haya sostenido una relación consensual**, o la persona con quien haya procreado un hijo o hija, para causarle daño físico a su persona, a los bienes apreciados por ésta, excepto aquéllos que pertenecen privativamente al ofensor, o a la persona de otro o para causarle grave daño emocional, incurrirá en delito grave de cuarto grado en su mitad superior. (Énfasis nuestro.)

[34] El pliego acusatorio presentado en este caso, imputaba violación al Art. 3.1 de la Ley 54 bajo los siguientes términos:

> El referido acusado de epígrafe, allá para el día 21 de abril de 2009, en Manatí, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia de Puerto Rico, Sala de Arecibo; ilegal, voluntaria, maliciosa y con la intención criminal[,] empleó violencia física contra la Sra. Mirelsa Rosado Santiago, **con quien ha sostenido relaciones sexuales íntimas** consistente en que le tiró una lata de cerveza en el rostro causándole una laceración, le habló palabras soeces y la escupió en la cara varias veces.

cónyuge del agresor o agresora, o con quien haya convivido, sostenido una relación consensual, o procreados hijos, y tercero, que la fuerza o violencia se haya efectuado para causar daño físico a esa persona o a sus bienes.

Por otro lado, la Regla 35(c) de Procedimiento Criminal, regula lo concerniente al contenido de la denuncia y de la acusación. Esta Regla impone dos exigencias, en primer término, que se incluyan todos los elementos esenciales del delito imputado y, segundo, que se utilice un lenguaje al alcance de la comprensión del ciudadano promedio. El propósito de la Regla es informar al acusado del delito que se le imputa de forma tal que pueda preparar su defensa de manera adecuada. No hemos requerido que se empleen **"estrictamente las palabras usadas en la ley y podrá emplear otras que tengan el mismo significado."** (Énfasis nuestro.) *Pueblo v. Calvino Cereijo*, 110 DPR 691, 693-694 (1981). No se requiere por lo tanto, "seguir ningún lenguaje estereotipado o *talismánico." Íbid.*

En *Pueblo v. Meléndez Cartagena*, 106 DPR 338, 341 (1977) nos reiteramos en lo anterior indicando que "[la Regla 35(c) **n]o exige que la acusación siga fielmente las palabras de la ley.** Su propósito no es cumplir mecánicamente con una forma ritual, sino informar al acusado el delito que se le imputa de tal suerte que pueda preparar adecuadamente su defensa." (Énfasis nuestro.) Lo importante es que "el acusado pueda entender de qué se le acusa." *Pueblo v. Calviño Creijo*, *ante*, pág. 694. Igualmente, hemos sostenido que la Regla 35(c) debe ser

interpretada con liberalidad. *Pueblo v. Villafañe Fabián*, 139 DPR 134 (1995).

Debemos puntualizar que todo derecho, incluyendo el derecho penal, requiere interpretación. La interpretación comienza por el texto de la ley, "el cual tiene que ser entendido de acuerdo con el uso del lenguaje común, especial y sobre todo jurídico-penal." E. Mezger, *Derecho Penal*, Tomo I, Valleta Ediciones, Buenos Aires, 2004, pág. 39. Así, el Art. 13 del Código Penal de Puerto Rico en su primer párrafo ordena: "[l]as palabras y frases se interpretarán según el contexto y el significado sancionado por el uso común y corriente." Este mandato recoge la llamada interpretación gramatical, la cual "aunque de un grado inferior de la interpretación", L. Jiménez de Asúa, *La Ley y El Delito,* Editorial Sudamericana, 13 ed., Buenos Aires, 1984, pág. 112, cumple una misión importante porque el legislador "muchas veces emplea términos que tienen un doble significado…." F. Muñoz Conde, *Introducción al Derecho Penal*, editorial B de f, 2nda ed, Montevideo, 2001, pág. 218.

Antes bien, el maestro Jiménez de Asúa nos indica que no es suficiente la interpretación gramatical sino que el juez deberá "valerse armónicamente" del medio teleológico. Jiménez de Asúa, *op. cit*. Mediante esta regla de interpretación, es que "mejor [se] descubre la íntima significación de los preceptos, la verdadera voluntad de la ley, deduciéndola, no sólo de las palabras, sino de los múltiples elementos que contribuyen a formar las disposiciones legislativas." *Íbid,* pág. 113. Este método de interpretación se recoge en el último párrafo del Art.

13 del Código Penal, donde se dispone: "Si el lenguaje empleado es susceptible de dos o más interpretaciones, debe ser interpretado para adelantar los propósitos de este Código y del artículo particular objeto de interpretación."

En la interpretación teleológica, el criterio del bien jurídico protegido por la ley interpretada, "juega un importante papel." Muñoz Conde, *op. cit.*, pág. 230. Este mecanismo de interpretación "se fuerza en orientar la atención hacia el bien jurídico tutelado por la norma y, por tanto, hacia el fin concreto." *Íbid.* Ello supone una interpretación dinámica que adapte la ley a "las exigencias de la vida del presente… Dado que se debe averiguar la voluntad de la ley y no sólo la voluntad del legislador…." Mezger, *op. cit.* O, en palabras de profesor Muñoz Conde, "estableciendo una conexión entre el momento en que nació la ley y el momento en que se aplica, entre el ayer y el hoy." Muñoz Conde, op. cit., pág. 231. Véanse también, D. Nevares Muñiz, *Derecho Penal,* 6ta. ed., Instituto para el Desarrollo del Derecho, Inc., San Juan, 2010, págs. 113-114; D. Nevares Muñiz, *Nuevo Código Penal de Puerto Rico*, Instituto para el Desarrollo del Derecho, Inc., San Juan, 2008, pág. 17.

¿Qué valor tutela la Ley 54? Comprender su verdadero alcance y adquirir conciencia de su justicia, son necesidades de primer orden para asegurar, primero, la correcta aplicación de esta norma, y segundo, que dicha aplicación sea igual para todos, esto es, "acorde con el postulado de seguridad jurídica." E. Ramón Ribas,

*Violencia de Género y Violencia Doméstica*, Tirant lo Blanch, Valencia, 2008, págs. 39-40.

II

No hay duda que la Ley 54 pretende proteger la integridad física y dignidad de las mujeres víctimas de violencia doméstica. La violencia contra las mujeres es un fenómeno mundial que ha requerido atención a nivel global. Tal es así que las Naciones Unidas, en la Conferencia Mundial sobre los Derechos Humanos celebrada en Viena en 1993, aprobó la Declaración sobre la eliminación de la Violencia contra las Mujeres, la que definió como: "Todo acto de violencia basado en la pertenencia al sexo femenino que produzca o pueda producir a las mujeres daño o sufrimiento físico, psicológico y sexual, incluidas las amenazas, la coacción o la privación arbitraria de libertad que ocurran en la vida pública o privada. … [Es] una manifestación de las relaciones de poder históricamente desiguales entre el hombre y la mujer que han conducido a la dominación de la mujer y a la discriminación en su contra por parte del hombre." (ONU 1993).

La violencia en la relación de pareja se ejerce para mantener y reforzar la relación de dominación de un colectivo sobre otro. Se trata de un tipo de violencia asociada directamente a la "discriminación estructural de un determinado grupo social, a la posición de subordinación que ocupan sus integrantes en el contexto comunitario." P. Laurenzo Copello, "La violencia de género en el derecho penal: un ejemplo de paternalismo punitivo", en P. Laurenzo Copello, M. Luisa Maqueda, A.

Rubio (coordinadoras), *Género, violencia y derecho*, Editoriales del Puerto, Buenos Aires, 2009, pág. 276. Esta violencia se expresa "mediante conductas y actitudes basadas en un sistema de creencias sexista y heterocentrista, que tiende a acentuar las diferencias apoyadas en los estereotipos de género, conservando las estructuras de dominio que se derivan de ellos.", J. Corsi, "La violencia en el contexto familiar como problema social", en J. Corsi (compilador), *Maltrato y abuso en el ámbito doméstico. Fundamentos teóricos para el estudio de la violencia en las relaciones familiares*, Ed. Paidós, Buenos Aires, 2003, pág. 18.

Dicho de otra forma, "la violencia en la relación de pareja se alimenta de las visiones y los roles estereotipados que promueven la subordinación de las mujeres…." E. Vicente, *Interpretación Discriminatoria y Odiosa*, www.derechoalderecho.com. Con lo cual, no es difícil concluir que la violencia en la pareja la sufre la mujer por el hecho de ser mujer. No por pertenecer a este sexo, no por los rasgos biológicos que las distinguen de los hombres, "sino por los roles subordinados que le asigna la sociedad patriarcal." Corsi, *op. cit.* Ello precisamente obliga a concluir que la violencia en la pareja, conceptualizada desde la perspectiva de género, nos habla de la violencia contra las mujeres como **una forma de discriminación** que, para minimizar su impacto, precisa de acciones positivas de parte del Estado, tal como la Ley 54.

"La Ley Número 54 … se diseñó, se redactó, se defendió y se promulgó con el propósito expreso de proveer

protección a la vida, a la seguridad y a la dignidad de las sobrevivientes de violencia en la relación de pareja. No se adoptó para proteger a la familia. Tanto es así que los remedios que provee garantizan el desalojo del agresor y su arresto inmediato, sacándolo así de la vida familiar que la conducta violenta ya ha destruido." Vicente, *íbid*.

La Ley 54 tutela entonces, como primer valor, la protección de **la integridad física y sicológica de la persona** que se encuentra sumida en una relación de subordinación y que sufre sus consecuencias. Pero el bien jurídico protegido trasciende y se extiende más allá de la protección de la integridad física y psíquica. El maltrato mental y físico y las vejaciones que sufre la mujer en la relación de pareja, son contrarios a valores constitucionales de primer orden como el derecho a la dignidad de la persona, al libre desarrollo de su personalidad y el derecho a no ser discriminado. Estos son entonces, como corolario lógico, bienes jurídicos tutelados también por la Ley 54. En este tenor se ha sostenido lo siguiente: "el clima mismo en que se contextualiza la relación típica determina que el objeto de protección desborde la mera contemplación de la situación de riesgo para entroncar con conceptos más amplios de dignidad, bienestar, seguridad y tranquilidad, cuya tutela supera la contemplación aislada de los resultados lesivos que eventualmente llegaran a producirse." C. Gómez Rivero, *Algunos aspectos del delito de malos tratos*, *Revista Penal*, n° 6, 2000, pág. 71.

III

Al trasladar al asunto que nos convoca los principios antes discutidos es razonable concluir que, en efecto, relación sexual íntima está contemplada en el delito de maltrato del artículo 3.1 de la Ley 54 cuando allí se habla de relación consensual. Esta interpretación es la que nos permite interpretar la ley como un todo y permite hacer efectivo el bien jurídico tutelado por la Ley 54.

La Ley 54 pretendió abrigar bajo su manto de protección algo más que una agresión física y algo más que la violencia que se suscita en la relación entre cónyuges. Véase, E. Vicente, *Beyond Law Reform: The Puerto Rico Experience in the Construction and Implementation of the Domestic Violence Act*, 68 Rev. Jur. UPR 553 (1999). Es por ello que la ley no distingue entre personas casadas o no casadas entre sí; no importa tampoco que la víctima y el agresor estén separados o viviendo juntos; ni si están divorciados; ni si están sosteniendo en efecto una relación consensual, bastando que la hayan sostenido; como ciertamente no importa que estén casados con otra persona al momento de su relación. A fin de cuentas, la Ley 54 pretendió cobijar distintas relaciones íntimas de la pareja donde se susciten incidentes de violencia doméstica.

En ese contexto, sostener, como hace el Tribunal de Apelaciones que hablar de una relación consensual en el contexto de la Ley 54 es algo distinto a una relación sexual para efectos de ésta es, a mi juicio, irrazonable. Ambas, necesariamente, hablan de lo mismo. Ambas se refieren a una relación íntima establecida por el consentimiento de ambas partes. Esa relación sexual

supone una relación consensual íntima. Esta interpretación es la que permite, en el contexto de la Ley 54, impartirle un significado a la letra de la Ley que sea cónsono con su propósito y que sirva para adelantar sus objetivos. Lo cierto es que la protección está allí dispuesta, el "problema" reside en la utilización de una descripción inadecuada. L. Jiménez de Asúa, *op. cit.*, pág. 117. "El juez moderno no crea el Derecho, pero sí ejerce función creadora. Las leyes yacen inertes, flácidas, y el juez, a virtud del proceso de subsunción, las vitaliza." *Íbid*, pág. 120.

Tomando en cuenta lo que ya hemos indicado previamente, de que la Regla 35(c) de Procedimiento Criminal no requiere la utilización de palabras mágicas sino que lo importante es que el acusado entienda el delito que se le imputa y que la interpretación del delito y su texto debe adelantar el objetivo de la Ley 54, es evidente que la acusación en el caso de epígrafe sí imputaba el delito descrito en el Art. 3.1 de la Ley 54, por lo que fue un error desestimarla y revocar la convicción del recurrido. La posición que asumió el foro apelativo me parece, como poco, desatinada; por ello estoy conteste con la determinación de este Tribunal de revocarla y reinstalar el fallo condenatorio emitido por el Tribunal de Primera Instancia contra el señor Pérez Feliciano por infracción al Art. 3.1 de la Ley 54.

IV

De ordinario, nuestras expresiones hubiesen concluido aquí. Ahora bien, la referencia en la **sentencia** dictada hoy por el Tribunal a *Pueblo v. Flores Flores*, res 23 de

marzo de 2011, 181 D.P.R. ___, 2011 TSPR 38, me impone la obligación de plasmar mi rechazo con tal proceder. Me explico.

De entrada, debemos apuntar que es norma trillada de adjudicación que, de ordinario, **no procede citar sentencias de este Tribunal**, pues como sabemos éstas no sientan precedente por lo que es impropio invocarlas. La escueta sentencia dictada en *Flores Flores*, *ante,* provocó sendas opiniones de conformidad y disidente. Hoy, la mayoría cita con aprobación, tal cual fuera la Opinión del Tribunal, expresiones de la Opinión de conformidad dictada en *Flores Flores*, *ante*. Sin más, esto me parece, jurídicamente, impropio.

Pero nos provoca mayor consternación el hecho de que con esa referencia la mayoría parece validar una posición doctrinal desacertada e insensible. Véanse entre otros, E. Vicente, *Interpretación Discriminatoria y Odiosa*, www.derechoalderecho.com; É. Fontánez Torres, *Mujeres A*, www.poderespacioyambiente.blogspot.com; É. Fontánez Torres, *"La obligación de los jueces del Supremo no incluye imponer(nos) su propio código de moralidad"*, www.poderyambiente.blogspot.com.

Como sabemos, en *Flores Flores*, *ante,* el dictamen emitido negó la protección de las disposiciones de la Ley 54 a una mujer por el hecho de ésta estar casada cuando sostuvo relaciones íntimas con su agresor, entonces su pareja. Sin duda, la determinación del Tribunal en *Flores Flores, ante*, "constituye un tortuoso malabarismo que maltrata y lacera una pieza legislativa que ha provisto remedios a miles de personas agobiadas por la violencia en

la pareja. También agrede el derecho a la igual protección de las leyes y discrimina contra un sector de la sociedad puertorriqueña – las mujeres sobrevivientes de violencia doméstica en una relación de pareja con un hombre distinto al marido o quien está casado con otra mujer. … Se trata de una decisión discriminatoria y odiosa. Discriminatoria porque se ensaña con un sector de la población que no se acomoda a la visión tradicional del tipo de relación de pareja que tenemos derecho a formar en Puerto Rico. Odiosa, porque abona al clima de prejuicio que aún se respira en esta Isla contra las mujeres que se alejan del mandato fundamentalista de ser hija-madre-esposa abnegada y subordinada." E. Vicente, *ante.*

El dictamen en *Flores Flores, ante*, y la Opinión de conformidad, a mi juicio, traslucen una lamentable incomprensión sobre qué es la violencia doméstica/en la pareja/machista/contra las mujeres, y el valor que tutela la Ley 54. Esta ausencia de un constructo jurídico válido sobre el cual hacer descansar los dictámenes suscritos, pudiera explicar, aunque no justificar, los profundos errores en que incurre. Por lo que es lamentable que hoy se invoque con aprobación lo allí señalado.

Indicamos previamente, que la Ley 54 tutela, como valor primario, la protección de la integridad personal de aquéllas que sufren agresión de parte de sus parejas. Ello no obstante, la Opinión de conformidad citada con aprobación yerra al procurar identificar el valor tutelado por la ley.

Allí se sostiene que el bien tutelado es "la institución familiar". Lo que da pie a negarle protección

a la mujer en ese caso ya que su agresión la sufrió mientras mantenía una relación con el agresor estando ella casada con otra persona.  Y, se razonó, que ya que el adulterio está tipificado como delito y este delito atenta, precisamente, contra la integridad de la "unidad familiar", no procede extender la protección reclamada bajo la Ley 54 a la mujer adúltera.  A las que han venido a llamar:  "Mujeres **A.**"[35]

Aseverar que el bien tutelado por la Ley 54 es la integridad de la unidad familiar es lo mismo que concluir que quien sufre la lesión es la familia.  Según esta visión, los casos de violencia doméstica lo que plantean es un problema de naturaleza familiar y por lo tanto, de carácter privado.  "Las referencias a la institución familiar como objeto de tutela abonan, … [a] la idea de que el maltrato que sufren las mujeres a manos de sus parejas constituye un problema, en tanto doméstico, esencialmente privado."  Ramón Ribas, *op. cit.,* pág. 33. Véase también, P. Laurenzo Copello, *La violencia de género en la Ley Integral.  Valoración político-criminal,* Revista Electrónica de Ciencia Penal y Criminología, núm. 07-08, 2005, pág. 7.  Postura peligrosa pues sirve para fomentar "uno de los prejuicios culturales que en mayor medida han obstaculizado la persecución de la violencia de género, convirtiéndola en un asunto de familia que el propio grupo está llamado a resolver."  *Íbid.*

---

[35]Véase,    É.    Fontánez   Torres,    Mujeres    A, www.poderespacioyambiente.blogspot.com.

La doctrina científica sin embargo, rechaza el enfoque expresado en *Flores Flores, ante*. Ésta sostiene que, en la actualidad, la institución familiar "admite diversas modalidades (e, incluso, que es reciente la aparición de nuevas formas familiares), **por lo que su protección no persigue conservar un determinado modelo de familia sino, encerrando ésta un entramado de derechos y deberes entre sus miembros […] cuya función, en suma, no es proteger la familia en sí, sino determinadas relaciones jurídicas nacidas en su seno."** (Énfasis nuestro.) Ramón Ribas, *op. cit.*, págs. 59-60. Véase además en igual sentido, J. Ramos Vázquez, *La problemática del bien jurídico protegido en los delitos de malos tratos ante su (pen)última reforma*, en Anuario da Falcultades de Dereito da Universidades da Coruña, núm. 9, 2005, págs. 746-747 ("la protección de un bien jurídico como la familia *tout court* o la paz y la convivencia familiar supone una intolerable violación del principio de intervención mínima, amén de plantear numerosos problemas, dada su inconcreción."); P. García Álvarez, J. del Carpio Delgado, *El delito de malos tratos en el ámbito familiar. Problemas fundamentales*, Tirant lo Blanch, Valencia, 2000, pág. 23 ("resulta dudoso que la familia pueda ser concebida como valor susceptible de una abstracta tutela penal distinta de la de sus miembros."); N. Castelló Nicás, *Problemática sobre la concreción del bien jurídico protegido*, en Estudios Penales sobre Violencia Doméstica, coord. L. Morillas Cueva, Madrid, 2002, pág. 67.

De otra parte, en la medida en que los remedios provistos por la Ley 54 garantizan la expulsión y

separación del agresor del "seno familiar", nos parece un contrasentido decir que lo que tutela la ley es precisamente la unidad familiar. La profesora Vicente lo expresa de la siguiente manera, citamos nuevamente: "La Ley Número 54 … se diseñó, se redactó, se defendió y se promulgó con el propósito expreso de proveer protección a la vida, a la seguridad y a la dignidad de las sobrevivientes de violencia en la relación de pareja. **No se adoptó para proteger a la familia. Tanto es así que los remedios que provee garantizan el desalojo del agresor y su arresto inmediato, sacándolo así de la vida familiar que la conducta violenta ya ha destruido.**" (Énfasis nuestro.) Vicente, *íbid*.

Antes bien, sabemos que la Ley 54 ofrece protección a aquellas personas que han mantenido una relación de pareja. Y, define la relación de pareja como: "la relación entre cónyuges, **ex cónyuges**, las personas que cohabitan o **han cohabitado**, las que sostienen o **han sostenido** una relación consensual íntima y los que han procreado entre sí un hijo o una hija." (Énfasis nuestro.) 8 LPRA sec. 602(m). Tomando como válido lo propuesto en la opinión de conformidad de que el bien jurídico tutelado por la Ley 54 es la familia, debemos preguntarnos lo siguiente: ¿a qué familia se protege en casos que involucren a ex cónyuges, o aquéllos que han cohabitado, o a los que han sostenido una relación consensual íntima? ¿Lo que se tutela es la familia que constituyeron mientras cohabitaban? ¿Y los que nunca convivieron mas sostuvieron una relación consensual íntima, qué? ¿O es que lo que se piensa es que la Ley 54

sólo ofrece protección a quienes conviven pues sólo éstos constituyen familia?  O peor aún, ¿es que la familia a que se refiere el dictamen es aquélla que se estima ideal y correcta en función de una visión personal y moralista sobre lo de debe ser la familia?  Si fuera esto último, nos encontraríamos en una pendiente escurridiza camino hacia un dirigismo social inaceptable.

El valor tutelado por la Ley 54 no es la unidad familiar.  La Ley 54 tutela, como ya dijimos, la protección de **la integridad física y sicológica de la persona** que se encuentra hundida en una relación de subordinación y que sufre sus consecuencias.  Pero también, procura salvaguardar valores constitucionales de primer orden como el derecho a la dignidad de la persona, al libre desarrollo de su personalidad y el derecho a no ser discriminado.

Por todo lo anterior me veo precisada a disentir de la sentencia dictada en aquella parte que procura validar el dictamen en *Flores Flores.*

V

Al cierre, una última reflexión.  Obligada ésta por las expresiones hacia esta opinión disidente.

Como sabemos, no siempre es posible lograr un consenso o unanimidad al momento de tomar una decisión. Eso es así en la sociedad en general cuando se toman decisiones colectivas y por supuesto, es igual en un cuerpo colegiado como este Tribunal.  En el campo que nos ocupa, el Tribunal Supremo de Puerto Rico, la disidencia juega un papel importante que permite validar la propia

legitimidad de la institución en la que servimos. Es lamentable que no se aprecie y se valore ese rol.

En el ámbito jurídico, la opinión disidente es el mecanismo de expresión democrática para quien difiere del criterio mayoritario. Esa expresión constituye el ejercicio del derecho a la libertad de expresión del juez ponente y el Tribunal, como cuerpo, lo debería celebrar y garantizar. Véase, Stanley Fuld, *The Voices of Dissent*, 62 Colum. L. Rev. 923, 926 (1962)("I am positive that disagreement among judges is as true to the character of democracy, and as vital, as freedom of speech itself. The affairs of government, no less that the work of the courts, could not be conducted by democratic standards without that right of dissent. Indeed, we may remind ourselves, unanimity in the law is possible only in fascist and communist countries.")

Pero más importante aún, la expresión disidente es una herramienta para validar la legitimidad de una corte de última instancia, como lo es este Foro. Me explico.

Contrario a las otras dos Ramas de gobierno, la Rama Judicial, en especial este Tribunal, toma sus decisiones en secreto. La confidencialidad que rodea –y debe rodear-- los trabajos de esta Curia hace de ello uno de nuestros imperativos adjudicativos. Así, nuestro proceso de adjudicación no se discute públicamente salvo, claro está, cuando se publica nuestro dictamen. Ese elemento misterioso, aunque necesario e imprescindible, es contrario a los principios sobre los que se asienta la democracia deliberativa e incide, necesariamente, sobre la legitimidad de un Tribunal Supremo. En este rigor

entonces, la opinión disidente cumple un rol fundamental porque abre un resquicio a través del cual observar el proceso deliberativo de los miembros de un foro colegiado como éste.

En este sentido, se ha indicado:

[T]he practice of publishing dissenting opinions alongside the opinion of the Court, with notation of which Justices join these opinion exposes the deliberative character of the Court's decisionmaking. The practice of dissent shows that the formation of the Court's judgment involves not merely a principled extension of its previous decisions, but an 'argumentative interchange' among its current members. […] The publicity of dissenting opinions and the indication of Justices' individual endorsements of particular opinions reveal that the Justices do confront each other with their disagreements about matters of principle through the exchange of opinions and the conversation that surrounds them, if not also in their formal conferences. **In this way, the practice of dissent manifests the exchange of reasons along the Justices that characterizes their process of desisionmaking; without this practice, those of us outside the Court would have no way to see the Court as embodying a deliberative process of judgment.** (Énfasis nuestro.)

Kevin Stack, *The Practice of Dissent in the Supreme Court*, 105 Yale L.J. 2235, 2257 (1996). Véase también, Cass Sunstein, *Why Societies Need Dissent*, Harvard University Press, Cambridge, 2003; Frank Michelman, *Conceptions of Democracy in American Constitutional Argument:  The Case of Pornography Regulation*, 56 Tenn. L. Rev. 291, 293 (1989).

Por otro lado, la opinión disidente contribuye a fortalecer el criterio mayoritario. Obligan a quien es jurista, a mirar su trabajo desde otra perspectiva y con otros ojos para, en consecuencia, atender las debilidades

de su fundamentación afinando su criterio. En este tenor, conviene internalizar lo dicho por la Juez Ginsburg: "My experience teaches that there is nothing better than an impressive dissent to improve an opinion for the Court. A well reasoned dissent will lead the author of the majority opinion to refine and clarify her initial circulation." Ruth Bader Ginsburg, *The Role of Dissenting Opinions*, The 20th Annual Leo and Berry Eizenstat Memorial Lecture, 2007.

La disidencia vigorosa no es más que un reflejo de un robusto e independiente Poder Judicial. Se revela así como un detente para quienes intenten neutralizar, controlar o intimidar a los miembros de esta Rama de gobierno. Lo que evidentemente redunda en el fortalecimiento de nuestra Democracia. Sobre este particular, el Juez Douglas apuntó lo siguiente:

> Certainty and unanimity in the law are possible both under the fascist and communist systems. They are not only possible; they are indispensable; for complete subservience to the political regime is a *sine qua non* to judicial survival under either system. One cannot imagine the courts of Hitler engaged in a public debate over the principles of Der Führer, with a minority of one or four deploring or denouncing the principles themselves. One cannot imagine a judge of a communist court dissenting against the decrees of the Kremlin….

William O. Douglas, *The Dissent: A Safeguard for Democracy*, 32 Journal of Am. Judicature Society 104, 105 (1948), citado en Andrew Lynch, *Dissent: The Rewards and Risks of Judicial Disagreement in the High Court of Australia,* 27 Melbourne U. L. Rev. 724, 727 (2003).

El disenso es, parafraseando al Juez Presidente Hughes, un llamado a la inteligencia del futuro para que corrija los errores del pasado. El Juez Scalia considera

que las opiniones disidentes engrandecen, en vez de desmerecer, el prestigio del Tribunal. Y ha explicado lo siguiente: "When history demonstrates that one of the Court's decisions has been a truly horrendous mistake, it is comforting … to look back and realize that at least some of the [J]ustices saw the danger clearly and gave voice, often eloquent voice, to their concern." Citado en Ginsburg, *ante.*

Disentir es una obligación ínsita a nuestra función de procurar Justicia para todos. "[T]he obligation that all of us, as American citizens have, and that judges, as adjudicators, particularly feel, is to speak up when we are convinced that the fundamental law of our Constitution requires a given result. ...The right to dissent is one of the great and cherished freedoms that we enjoy by reason of the excellent accident of our American births." William Brennan, *In Defense of Dissents*, 37 Hastings L.J. 427, 438 (1986).

A modo de epílogo diré que la homogenización del pensamiento ha sido y será un síntoma de una grave enfermedad: el totalitarismo. Véase Hannah Arendt, *The Origins of Totalitarianism*, Harcourt Inc., New York New Ed., 1985. Acallar a la disidencia restándole importancia o valor a sus argumentos o, incluso, sugiriendo que los mismos se esbozan para adelantar posturas personales es una forma de violencia simbólica que no podemos validar. La Democracia no es meramente una palabra para ser invocada a conveniencia; la Democracia es un compromiso y una promesa

que nos exige pronunciarnos en pos de la justicia y la equidad.[36]


                                    Anabelle Rodríguez Rodríguez

---

[36] Cierto es que la honestidad intelectual debe ser un deber que esta Curia no puede eludir. En aras de lo anterior, y aunque la ruta de vida de las profesoras Esther Vicente y Érika Fontánez Torres hablan por sí solas, me parece intelectualmente honesto precisar que la profesora Érika Fontánez Torres no sólo es editora del blog Poder, Espacio y Ambiente www.poderyambiente.blogspot.com y www.derechoalderecho.org sino también es Catedrática asociada de la Escuela de Derecho de la Universidad de Puerto Rico. Enseña los cursos de Derecho civil patrimonial y Teoría General del Derecho. Trabaja temas relacionados al Derecho y la Teoría Social, la Sociología y la Teoría General del Derecho; ha hecho investigación socio-jurídica aplicada a los temas de Propiedad, Género, Democracia y Medioambiente. Es abogada colaboradora de la Clínica de Asistencia Legal de la misma Escuela. Además es participante del Seminario en Latinoamérica de Derecho Constitucional y Teoría Política de la Universidad de Yale y autora de numerosas publicaciones. Por su parte, la profesora Esther Vicente es profesora asociada de la Escuela de Derecho de la Universidad Interamericana de Puerto Rico. Enseña cursos de Derechos Humanos, Teoría Feminista, Derecho de Familia, Derechos Reales, Derecho Administrativo, entre otros. Además, en mayo de 2002 obtuvo un Doctorado en Derecho de la Universidad de Londres en Inglaterra. De igual manera, participó activamente en la redacción de la Ley 54 como miembro del Comité que la elaboró, siendo su participación una fundamental. Asimismo forma parte del Latin American and Caribbean Committee for the Defense of Women's Rights, the International Planned Parenthood Federation y el Seminario en Latinoamérica de Derecho Constitucional y Teoría Política de la Universidad de Yale. Es autora, también, de numerosas publicaciones. De más está decir que ambas son destacadas juristas.

Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

      Peticionario

        v.

                                      CC-2010-762

Eligio Pérez Feliciano

      Recurrido

Opinión de Conformidad emitida por el Juez Asociado señor MARTÍNEZ TORRES al cual se unen la Jueza Asociada señora PABÓN CHARNECO y el Juez Asociado señor KOLTHOFF CARABALLO

En San Juan, Puerto Rico, a 16 de diciembre de 2011.

La Opinión Concurrente de la Juez Asociada señora Rodríguez Rodríguez[37] merece un breve comentario, por lo que representa en términos de filosofía adjudicativa y del rol de la concurrencia y la disidencia en un foro colegiado. Por supuesto, el derecho a concurrir o a disentir -y la elección del momento y las palabras al hacerlo- no está en disputa. Esa es una prerrogativa individual de cada miembro del Tribunal que no es ni puede ser

---

[37] La llamamos por su nombre correcto, ya que a pesar de su título, la "Opinión Concurrente y Disidente" no disiente del resultado sino de los fundamentos de la Sentencia del Tribunal. Por definición, eso es una opinión concurrente.

amordazada. Ahora bien, la elección de cada uno de nosotros al opinar y las palabras que utilizamos tienen consecuencias. Según se tiene el derecho a concurrir o disentir también se tiene el derecho, individual y colectivo, a reaccionar. En fin, si al opinar individualmente se utiliza un tono hiriente, personalista y ofensivo nadie se puede ofender si los implicados hacen un llamado a la cordura y al temperamento judicial. En otras palabras, no se puede reclamar tolerancia en un tono intolerante. Al fin y al cabo, todas las posiciones tienen valor y merecen respeto mutuo. Cuando se quiebra ese balance se abandona el temperamento que rige nuestro comportamiento judicial y se importan estilos ajenos al clima de sosiego y deliberación que nuestra sociedad exige de este Tribunal.

Con eso en mente, no deja de sorprenderme la reacción de la concurrencia a la referencia en la Sentencia del Tribunal a Pueblo v. Flores Flores, res. el 23 de marzo de 2011, 2011 T.S.P.R. 38, 2011 J.T.S. 43, 181 D.P.R. ___ (2011). Es perfectamente legítimo (y hasta casi una obligación si se es honesto intelectualmente) que el Tribunal explique cómo entiende que su decisión en este caso compagina con lo resuelto entonces. La disidencia tiene el perfecto derecho a opinar que ambas decisiones son incompatibles pero tiene que reconocer también que los que no opinan así pueden -y hasta cierto punto, deben- explicar su posición.

Irónicamente, la concurrencia objeta que se cite nuestra Sentencia en Pueblo v. Flores Flores, íd., pero en cambio no cita una sola fuente de derecho para disentir, no del caso que tenemos ante nos, sino de lo resuelto entonces. En ese proceder extraño no se cita el texto del Art. 3.1 de la Ley para la Prevención e Intervención con la Violencia Doméstica, Ley Núm. 54 de 15 de agosto de 1989, según enmendada, 8 L.P.R.A. sec. 631. En su lugar, se cita el blog www.poderespacioyambiente.blogspot.com. No se hace referencia al historial legislativo del estatuto. En cambio, se hace referencia al blog www.derechoalderecho.com para aseverar que la decisión que este Tribunal emitió hace nueve meses es odiosa y discriminatoria. Solo faltó citar las frases de Mafalda (http://www.todohistorietas.com.ar/frasesdemafalda.htm). En fin, tal parece que debíamos ignorar el derecho aplicable para en su lugar, recoger las opiniones de algunas cibernautas. Si lo hacemos, ¿cuál es el límite? En lugar de citar la Constitución federal, ¿citaremos www.theonion.com? ¿Obviaremos la Constitución de Puerto Rico para en cambio citar un blog como El Ñame (www.elname.com)?

Por supuesto, los blogueros y cualquiera de los integrantes de este Tribunal tienen perfecto derecho a creer que la ley debe cambiar para acoger la posición que se esboza en la Opinión Concurrente. Sin embargo, la labor del Poder Judicial, a diferencia del rol de la Asamblea Legislativa y de las opiniones en la blogosfera, es el de

interpretar la ley como está, no como quisiéramos que fuera.

Hay estudiosos del Derecho que opinan que en Pueblo v. Flores Flores, supra, el Tribunal estuvo en lo correcto al limitarse a aplicar la ley vigente de manera cónsona con el principio de legalidad en un caso penal. P. Malavet Vega, La violencia doméstica en la Ley 54, la literatura, la canción y el cine, Rep. Dom., Ediciones Omar, 2011, Cap. 13, págs. 287-288. Es una opinión tan respetable como la de las personas que discrepan. Por eso, cuando una integrante de este Tribunal ignora ese principio de respeto recíproco y en cambio, recoge la insinuación de que una decisión de sus compañeros Jueces encierra motivos odiosos y discriminatorios, se trae al seno de este Foro una campaña externa de demonización. Se rompe así el ambiente de deliberación colegiada que todos estamos obligados a mantener y fomentar. Si se me van a imputar motivos, solo acepto que sea el del respeto a la ley por encima de mis opiniones personales sobre la sabiduría o defectos de un estatuto. Véase, Art. 21 del Código Civil, 31 L.P.R.A. sec. 21.


RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

v.

Eligio Pérez Feliciano

    Recurrido

CC-2010-0762

Opinión de Conformidad emitida por el Juez Asociado señor Rivera García a la cual se une el Juez Asociado señor Feliberti Cintrón.

En San Juan, Puerto Rico, a 16 de diciembre de 2011.

Ante las expresiones vertidas en la opinión concurrente y disidente me veo precisado a enunciar una opinión para atender los desaciertos de las mismas.

Como es harto conocido, nuestros dictámenes emitidos mediante sentencia no establecen ni constituyen un precedente judicial. Sin embargo, ello no es óbice para ilustrar a la comunidad jurídica sobre lo dispuesto en estas decisiones judiciales cuando sea oportuno. **En atención a ello, es imperativo hacer constar que en la**

**sentencia avalada por la mayoría de este Tribunal citamos el caso de <u>Pueblo v. Flores Flores</u>, res. el 23 de marzo de 2011, 2011 T.S.P.R. 38, 2011 J.T.S. 43, 181 D.P.R. ___ (2011), a los únicos efectos de distinguir los hechos allí acaecidos de la controversia del caso de autos.** Considerando el contexto en el que citamos la referida sentencia, resulta desatinado interpretar que invocamos la misma con aprobación de lo allí señalado.

Así pues, la opinión concurrente y disidente yerra al aseverar que citamos la opinión de conformidad de <u>Flores Flores</u>, supra, con aprobación para identificar, lo que a su juicio, es el valor tutelado por la Ley Núm. 54. Al así proceder, los pronunciamientos allí enunciados resultan innecesarios, ya que no están en controversia o sencillamente no han sido planteados en este caso. <u>Ortiz v. Panel F.E.I.</u>, 155 D.P.R. 219, 252-253 (2001). En vista de lo anterior, las expresiones de la disidencia constituyen un *obiter dictum* y por ello son irrelevantes, ya que desvirtúan la verdadera controversia presentada ante este Tribunal en aras de adelantar posiciones personales y particulares. Por lo tanto, todas sus expresiones se deben tener por no puestas, ya que no constituyen un fundamento jurídico necesario para la correcta resolución del caso de autos. *Íd*. pág. 253.

Recordemos pues, que escribir una opinión disidente es una tarea que conlleva una gran responsabilidad. <u>Granados v. Rodríguez Estrada V</u>, 127 D.P.R. 1, 7 (1990);

Granados v. Rodríguez Estrada II, 124 D.P.R. 593, 614 esc. 6 (1989) (Citas internas omitidas). En relación a esta ardua labor, hemos expresado que los jueces de un tribunal estatal de última instancia no deben dar cabida a la censura desmesurada, a la extrema vituperación, a acusaciones de malsanas motivaciones de la opinión mayoritaria e insinuaciones de incompetencia, prejuicio o insensibilidad por parte de los otros jueces del tribunal. Íd. "[L]a opinión de un juez de última instancia debe expresar sus razones y no sus opiniones particulares". Íd.

Es por ello que, el respeto, la deferencia y el cuidado con el cual se confecciona una opinión disidente nunca debe ceder ante posturas personales, como tampoco a ataques a la buena función de este Foro. Pantoja Oquendo v. Municipio de San Juan, res. el 9 de junio de 2011, 182 D.P.R. __ (2011), 2011 T.S.P.R. 87, 2011 J.T.S. 87. Así, hemos señalado que "escribir una opinión disidente conlleva un grado mayor de celo y cuidado" porque "la voz disidente de todo foro colegiado enriquece a plenitud el jardín del quehacer jurídico". Íd.

Hoy confrontamos una opinión concurrente y disidente que no reconoce las circunstancias particulares del recurso que nos ocupa, las cuales son muy distintas de la controversia que fue planteada en Flores Flores, supra. A insistencia de la búsqueda personal de un motivo para reabrir una controversia ya resuelta por este Tribunal, se desvirtúa la controversia actual y se formulan

interrogantes que no guardan relación con la sana resolución del caso de autos.

Reiteramos que distinguimos los hechos del presente caso de aquellos acaecidos en Flores Flores, supra, para orientar a la comunidad jurídica con respecto al derecho aplicable en esta ocasión. Por consiguiente, al no ser pertinente a la controversia que hoy adjudicamos, es improcedente abrir nuevamente la discusión sostenida en Flores Flores, supra.

Ahora bien, debemos hacer hincapié que los pronunciamientos vertidos por los miembros de este Tribunal constituyen expresiones judiciales que pueden servir a los propósitos de auxiliar en la formulación de resoluciones futuras, y ello lejos de ser impropio, como se aduce, es jurídicamente conveniente y necesario. Claro está, lo anterior será así siempre que nos encontremos frente a controversias que lo ameriten y cuando ello sea pertinente para la correcta resolución de las mismas. Es de esta forma que se evita la divagación del derecho trayendo argumentos y discusiones que son ajenas a la controversia planteada.

Asimismo, en aras de fomentar un debate democrático y formativo, tanto en la Academia como en el resto de la comunidad jurídica, este Tribunal no puede hacerse de la vista larga e ignorar controversias previas y recientes. Más aun, cuando estas inciden de alguna forma sobre los cuerpos legales que permean las polémicas que nos atañen

actualmente. **Sin embargo, ello lo debe hacer, como mencionáramos antes, circunscribiéndose a los hechos y el derecho aplicable en cada caso.** Entendemos así, que al momento de resolver una controversia, es más que razonable avizorar ponencias anteriores y proveer las razones por las cuales disponemos hoy de determinada manera, **"sin sacar fuera de perspectiva el asunto planteado ni insuflándole dimensiones que no tiene"**[38]. Desentendernos de nuestra historia adjudicativa al ocuparnos de los hechos del presente, es un síntoma de miopía judicial que sencillamente no estamos dispuestos a avalar.

Nuevamente, enfrentamos la lamentable situación de que mediante el uso de palabras retóricas se intenta desmerecer los pronunciamientos fundamentados estrictamente en la aplicación del derecho. Al así proceder, la disidencia induce a confusión sobre cuáles son los verdaderos méritos de la controversia en discusión. No ponemos en tela de juicio el inmensurable valor de lo que constituye una opinión disidente; solamente esperamos que la misma sea honesta intelectualmente. No cabe más pedir. Aparte de ello, colegimos con aquellos señalamientos sobre la importancia de una opinión disidente cuando esta cumple con estos criterios, pues los mismos están en armonía con lo apuntalado en el caso de Pantoja Oquendo v. Municipio de

---

[38] Véase, Granados v. Rodríguez Estrada II, 124 D.P.R. 593, 616 (1989), opinión concurrente y de conformidad de la Juez Asociada señora Naveira de Rodón.

San Juan, supra. Así pues, me remito a las siguientes expresiones vertidas desde el primer día que asumí el cargo de Juez Asociado de este Tribunal:

> Como sabemos, Puerto Rico experimenta una diversidad de problemas sociales y económicos que inciden de forma dramática en todas las instituciones sociales y sobre los cimientos éticos. En consecuencia, observamos una sociedad cada vez más litigiosa en todos los ámbitos de la vida y, por ende, mayores desafíos al sistema judicial. A luz de esta realidad, estaré ávido a escuchar con rigor y detenimiento las posturas de los miembros de este Foro colegiado. Así también, exigiré ser escuchado en los procesos deliberativos ante nuestra consideración. De este modo, propiciaré que en la dinámica del foro colegiado se fortalezca el entendimiento y la razón. Me integro a este Tribunal con ánimo de alcanzar la armonía en nuestros pronunciamientos judiciales, apoyado en la fortaleza de los fundamentos jurídicos, la justicia y la equidad. Acorde con lo enunciado en el proceso deliberativo de esta curia, es preciso que haya diferencias de criterios y posturas en la interpretación del derecho. Esta diversidad es saludable y necesaria en la búsqueda de la justicia y la verdad.

> Estamos contestes que en toda discusión y análisis de controversias debe permear el respeto a la diversidad de opiniones y el fortalecimiento de los principios que rigen la Democracia. Es decir, el respeto a los pronunciamientos judiciales que sean avalados por la mayoría y aquellos que tenemos la responsabilidad de pautar el derecho. Es preciso recordar que vivimos tiempos de cambio y haciendo eco de expresiones del reconocido jurista, el Juez Benjamín Cardozo: "la causa y el fin del derecho es promover el bienestar social."

> Dicho lo anterior debo, además, apuntalar que en respeto a nuestra responsabilidad constitucional, cuando nuestra conciencia así lo dicte, ejerceremos el derecho de disentir con la mayor deferencia que se merece cada uno de mis compañeros y compañeras y nuestra propia

**institución.   Siempre será dentro de un escenario de diálogo y respeto intelectual y personal.[39]**

De una lectura objetiva e imparcial de los citados pronunciamientos, solo se puede colegir la importancia que reviste la disidencia en nuestro foro colegiado.   El recelo jamás debe nublar el entendimiento y la inteligencia de aquellos que tenemos la delicada responsabilidad de impartir justicia. Lo anterior, tiene un solo significado: avalar y respetar con vehemencia las diferencias de juicio, la diversidad de posturas filosóficas y el criterio de que el juez sea hacedor de la ley, negando sus propios impulsos  para seguir la verdad. Conforme a ello, siempre defenderemos y custodiaremos la deferencia y el respeto que se merece la voz disidente. Ahora bien, igual respeto exigimos en el ejercicio del derecho de expresarnos en nuestro foro colegiado.

Es por esto que, celebramos la disidencia como uno de los grandes beneficios nacidos de la libertad y del respeto a la dignidad humana.[40] Así también, creemos firmemente en los principios democráticos que enaltecen el quehacer jurídico de nuestro Tribunal. Sin embargo, reiteramos que las expresiones que enaltecen esta faena son aquellas que no inducen a error y tienen como norte la

---

[39] Mensaje del Juez Asociado Rivera García en la Ceremonia de Juramentación, 179 D.P.R. IX, XIX (2010).

[40] Véase, L. B. Solum, Reseña, The Value of Dissent, 85 Cornell L. Rev. 879, 880 (2000) (reseñando a S. H. Shiffrin, Dissent Injustice, and the Meanings of America (1999)).

sana resolución de las controversias que las partes traen ante nos.

"La decisión de las causas siempre debe entrañar la evaluación de materiales jurídicos y metajurídicos utilizados como medio para alcanzar el resultado a que se llega."[41] Sin embargo, no es menos cierto que, el buen juzgador, conoce de su "extraordinario poder […] en la formación del derecho" y también sabe que:

> tal condición no es licencia para insertar en el cuerpo jurídico sus preferencias personales, que las dificultades inherentes a la tarea de impartirles contenido a las reglas y las provenientes de las limitaciones de todo juez en la evaluación de los efectos sociales que pueda causar tal o cual solución al problema ante él o ella aconsejan modestia y prudencia en la emisión de sus juicios….[42]
> ……
> La objetividad no exige el abandono del criterio de vida de un juez, aunque ésta difiera de los conceptos que albergue la mayoría en un momento dado.[43]

Estamos en pleno acuerdo con las expresiones del Juez Trías Monge de que "[d]entro del crisol de un buen tribunal colegiado se espera que el arrojo de algunos sea templado por la cautela de otros. La divergencia de criterios dentro de un tribunal debe celebrarse".[44]

Vale la pena acentuar además que, hoy se ve como enemigo a cualquiera que insinúe siquiera remotamente que algo pueda ser más verdad que su contrario. No estamos de

---

[41] J. Trías Monge, Teoría de Adjudicación, 1ra ed, Ed. U.P.R., 2000, pág. 405.

[42] J. Trías Monge, op. cit., pág. 403.

[43] Ibíd., pág. 403.

[44] J. Trías Monge, op. cit., pág. 405.

acuerdo con esta apreciación. Esto porque esta lógica desafía el principio de no contradicción. La mayoría, al igual que la minoría, no puede pretender ni auto atribuirse que sus ideas son la verdad absoluta sin pasar por el crisol del debate democrático.

Asimismo, estamos contestes que la Democracia no es una mera palabra para ser invocada a conveniencia. La Democracia no deriva de que nada es verdad o mentira, sino del respeto a la dignidad humana y el valor participativo que adiciona cada integrante. Por ello, el verdadero compromiso con la justicia y los principios democráticos, en un foro colegiado, implica también respetar el criterio de cada uno de sus miembros y el uso de un razonamiento guiado por argumentos bien fundamentados en derecho, según sean pertinentes a cada controversia.

En consecuencia, no podemos renunciar a los estándares mínimos de respeto, honestidad intelectual y de razonamiento jurídico, menos aun cuando formamos parte de un foro judicial de última instancia. Aspiramos pues, no a la "homogenización de los pensamientos", sino a la discusión profunda y seria que debe imperar a la hora de resolver las controversias que día a día se nos presentan.

Edgardo Rivera García
Juez Asociado

CC-2010-0762
10